## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHAEL GANDELMAN,
individually and on behalf of all others
similarly situated,

    Plaintiff,

      v.

FCA US, LLC d/b/a STELLANTIS
NORTH AMERICA, a Delaware
Corporation,

    Defendant.

Case No.


**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................1

II.  JURISDICTION AND VENUE .............................................................5

III.  PARTIES ...............................................................................................6

    A.  Plaintiff .......................................................................................6

    B.  Defendant ....................................................................................6

IV.  FACTUAL ALLEGATIONS .................................................................7

    A.  FCA Marketed the Class Vehicles as Safe, Technologically-
    Advanced, and Ecologically Friendly ................................................11

    B.  The Battery Defect ...........................................................................16

        1.  The November 23, 2023 Recall (Recall 23V-787)...................19

        2.  Recall 23V-787 Was Under-Inclusive and Ineffective............23

        3.  The September 27, 2024 Recall (Recall 24V-720)...................24

    C.  FCA Knew or Should Have Known About the Battery Defect
    Long Before it Disclosed the Problem ................................................27

    D.  Plaintiff and Members of the Class and Sub-Class Suffered
    an Injury ..............................................................................................35

V.  TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL.....37

VI.  CLASS ACTION ALLEGATIONS................................................................39

VII.  CLAIMS FOR RELIEF ...............................................................................44

VIII.  PRAYER FOR RELIEF ...............................................................................69

IX.  DEMAND FOR JURY TRIAL .....................................................................70

The allegations herein are based on personal knowledge as to Plaintiff's own conduct, and are made on information and belief as to all other matters based on an investigation by counsel:[1]

## I.    INTRODUCTION

1.      Plaintiff Michael Gandelman brings this class action against FCA US, LLC d/b/a Stellantis North America ("FCA" or "Defendant"), individually and on behalf of all persons or entities in the United States who purchased, leased, or own a Class Vehicle (defined below), asserting claims for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* on behalf of the Nationwide Class (defined below), and for breach of express warranty, breach of implied warranty, fraud by omission/fraudulent concealment, negligent misrepresentation, violation of New York's General Business Law, N.Y. Gen. Bus. Law § 349, and violation of New York's General Business Law, N.Y. Gen. Bus. Law § 350 on behalf of the New York Sub-Class (defined below).

---

[1] Counsel's investigation includes an analysis of publicly available information, including consumer complaints made to the National Highway Traffic Safety Administration ("NHTSA") and additional analysis. Plaintiff believes that a reasonable opportunity for discovery will provide further support for the claims alleged herein. In addition, Plaintiff's counsel continues to investigate whether other model years contain the same defect. Plaintiff reserves the right to update the definition of Class Vehicles to include additional model years.

2.     The Class Vehicles include model years 2020-2024 Jeep Wrangler plug-in hybrid vehicles ("PHEVs") (including but not limited to Jeep Wrangler 4xes) and model years 2022-2024 Jeep Grand Cherokee PHEVs (including but not limited to Jeep Grand Cherokee 4xes) designed, manufactured, marketed, distributed, sold, leased, warranted, and/or serviced by Defendant (together, the "Class Vehicles"). The Class Vehicles have been built with a high voltage battery that is susceptible to separator damage and poses a potential fire risk (the "Battery Defect").[2]

3.     The Battery Defect poses a clear and significant safety risk to Plaintiff and members of the Class given the possibility that the Class Vehicles may suddenly and unexpectedly catch fire. The Battery Defect also poses a potential risk of fire damage to personal property.

4.     The Battery Defect is not new to Defendant. FCA began investigating the Battery Defect in May 2023, when FCA opened an investigation after receiving field reports of two fires originating from the high voltage ("HV") battery in two model year 2021 Jeep Wrangler PHEVs. Over the next several months, FCA

---

[2] A separator keeps the battery anode and cathode from touching. If the anode and cathode touch, it can produce a rush of electrons creating a short circuit, which can release heat and create a fire. *See* Carolyn Wilke, *Batteries should not burst into flames*, ScienceNewsExplores (Apr. 16, 2020), https://www.snexplores.org/article/lithium-ion-batteries-flames-fire-prevention-technology#:~:text=Physical%20damage%20can%20also%20cause,and%20set%20off%20thermal%20runaway.

received five additional reports of fires originating from the HV battery in model year 2021-2022 Jeep Wrangler PHEVs.

5.      It was not until November 2023, six months after it opened its investigation into fires in its PHEVs, that FCA initiated a safety recall related to the Battery Defect ("Recall 23V-787"), recalling 32,125 2021-2023 Jeep Wrangler PHEVs.

6.      FCA offered a remedy for the 23V-787 recall throughout 2024. However, this recall swiftly proved underinclusive, and the remedy proved ineffective.

7.      From April 2024 through July 2024, FCA received additional reports of fires originating from the HV battery in certain Jeep Wrangler PHEVs and Jeep Grand Cherokee PHEVs. And in June and July 2024, FCA received three reports of HV battery fires in Jeep Wrangler PHEVs that had received the remedy for Recall 23V-787.

8.      In August 2024, the manufacturer of the HV batteries used in the Class Vehicles suggested that the most likely root cause was separator damage combined with other complex interactions within the cell.

9.      In September 2024, FCA issued a second, more expansive recall related to the Battery Defect ("Recall 24V-720"). Recall 24V-720 expanded the number of affected vehicles ***nearly fivefold***—increasing from 32,125 vehicles to 154,032—and

included 2020-2024 model year Jeep Wrangler PHEVs and 2022-2024 model year Jeep Grand Cherokee PHEVs. FCA indicated that in these vehicles, the "high voltage battery may fail internally and lead to a vehicle fire while parked or driving" and advised owners to "park outside and away from structures, and not to recharge their vehicles until they are repaired."

10. No reasonable consumer expects to purchase or lease a vehicle containing a concealed defect that creates a risk of a vehicle fire and possible catastrophic danger. The Battery Defect is material to Plaintiff and members of the Class and Sub-Class. Had Defendant disclosed the Battery Defect, Plaintiff and members of the Class and Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

11. Moreover, not being able to plug in and charge the Class Vehicles defeats the central purpose of a plug-in hybrid electric vehicle. Absent charging, the Class Vehicles must run exclusively on their gasoline engine, which eliminates the benefits of having a PHEV and renders it unfit for its ordinary purpose.

12. Thus, as a direct result of Defendant's unlawful conduct, Plaintiff and members of the Class and Sub-Class have been harmed and are entitled to, *inter alia*, actual damages, including: damages for diagnosis, repair and/or replacement of the damaged components; damages for the diminished value of their vehicles;

compensatory, statutory, and punitive damages; attorneys' fees; costs; restitution; and/or injunctive and declaratory relief.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Class and Plaintiff and members of the Class and Sub-Class (as defined below) are citizens of a state different from Defendant.

14.    This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson-Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act, 28 U.S.C. § 1332 ("CAFA").

15.    This Court has personal jurisdiction over Defendant because FCA is headquartered in the State of Michigan; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within Michigan through promotion, sale, marketing, and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as FCA is "at home" in Michigan.

16.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because: Defendant FCA maintains operational facilities in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Plaintiffs may properly sue FCA in this District, where FCA is headquartered.

## III.   PARTIES

### A.     Plaintiff

17.     Plaintiff Michael Gandelman ("Plaintiff") is a citizen of the State of New York and resides in Woodbury, Nassau County, New York. Plaintiff leased a 2023 Jeep Wrangler 4xe from Brooklyn Chrysler Jeep Dodge Ram in Brooklyn, New York for personal, family, or household purposes, on or about May 21, 2023. On or about January 22, 2025, a software update was performed on Plaintiff's 2023 Jeep Wrangler 4xe at a Jeep Dealer, purportedly to "repair" the Battery Defect. The "repair" performed on Plaintiff's Class Vehicle did not involve replacing the defective PHEV battery.

### B.     Defendant

18.     Defendant FCA US, LLC ("FCA"), is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan. FCA is wholly owned by Stellantis N.V., a Dutch corporation

6

headquartered in Amsterdam, Netherlands. FCA does business as Stellantis North America ("Stellantis").

19.     Defendant designs, engineers, manufactures, markets, leases, and/or sells vehicles. Defendant markets and distributes vehicles for lease and sale under the Chrysler, Jeep, Dodge, Ram, Fiat, and Maserati brands through its authorized dealers located throughout the United States, including within this District.

20.     At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles, containing the defect described herein, throughout the United States. Defendant developed and disseminated the owner's manuals and warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states, including New York.

## IV.   FACTUAL ALLEGATIONS

21.     PHEVs like the Class Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Class Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce. In

7

addition to the environmental benefits, the PHEV design consumes less fuel and is supposed to provide more power and torque than traditional internal combustion engines, giving the Class Vehicles better acceleration and performance.

22.     FCA markets, leases, and sells PHEV models of its popular Jeep Wrangler and Jeep Grand Cherokee Vehicles, including the Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe. The 4xe (or "four by e") name is a play on "4x4" that highlights the vehicle's four-wheel drive and electric capabilities.

23.     FCA first introduced the Jeep Wrangler 4xe in September 2020, and the first models became available in the United States, Europe, and China in early 2021. The Jeep Wrangler 4xe is based on the Jeep Wrangler and is known for its off-road capability and electric range.

24.     FCA began selling the Jeep Grand Cherokee 4xe in 2022. The Jeep Grand Cherokee 4xe is based on the Jeep Grand Cherokee and is known for its luxury and off-road capability.

25.     The Jeep Wrangler 4xe is a PHEV that combines a turbocharged 2.0-liter four-cylinder engine with two electric motors. A picture of the 2024 Jeep Wrangler 4xe is below:



26.     The Jeep Grand Cherokee 4xe is a PHEV SUV with a powerful engine, off-road capabilities, and a spacious interior. A picture of the 2024 Jeep Grand Cherokee 4xe is below:



27.     The Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe remain the No. 1 and No. 3 best-selling PHEVs in the United States, respectively.[3]

---

[3] FCA, Press Release: *FCA Reports Fourth-quarter and Full-year 2024 Sales Results* (Jan. 3, 2025), https://www.prnewswire.com/news-releases/fca-reports-q3-2024-total-us-sales-302265584.html.

9

28.     In 2022, FCA sold 43,176 Jeep Wrangler 4xes and 5,686 Jeep Grand Cherokee 4xes.[4]

29.     In 2023, FCA sold 67,429 Jeep Wrangler 4xes and 45,684 Jeep Grand Cherokee 4xes.[5]

30.     In 2024, FCA sold a total of 55,554 Jeep Wrangler 4xes and 27,590 Jeep Grand Cherokee 4xes.[6]

31.     FCA offers New Vehicle Limited Warranty coverage for Class Vehicles for 3 years or 36,000 miles which includes all components other than normal wear and maintenance items, as well as HV Battery Limited Warranty Coverage for 10-years or 150,000 miles in states that do not have transmission zero emission vehicle ("TZEV") mandates, and 8-years or 100,000 miles in states that do have TZEV mandates, including New York.

---

[4] FCA, Press Release, *FCA Reports Fourth-Quarter and Full-Year 2022 Sales Results* (Jan. 4, 2023), https://www.prnewswire.com/news-releases/fca-reports-fourth-quarter-and-full-year-2022-sales-results-301713751.html.

[5] Press Release, FCA, *FCA Reports Fourth-Quarter and Full-Year 2023 Sales Results* (Jan. 3, 2024), https://www.prnewswire.com/news-releases/fca-reports-fourth-quarter-and-full-year-2023-sales-results-302025792.html.

[6] FCA, Press Release: *FCA Reports Fourth-quarter and Full-year 2024 Sales Results* (Jan. 3, 2025), https://www.prnewswire.com/news-releases/fca-reports-q3-2024-total-us-sales-302265584.html.

A.   **FCA Marketed the Class Vehicles as Safe, Technologically-Advanced, and Ecologically Friendly**

32.    FCA engages in direct marketing to consumers, such as Plaintiff and members of the Class and Sub-Class, via TV and radio commercials, print advertising, and the publication of vehicle brochures which are distributed through its network of authorized dealerships, in order to induce consumers to purchase or lease its vehicles. This comprehensive advertising campaign is ongoing.

33.    FCA's marketing for the Class Vehicles touted that customers could enjoy the same features they would with the Jeep Wrangler and Jeep Grand Cherokee, along with the additional benefits of a hybrid electric battery. PHEVs have significant environmental benefits over conventional vehicles: while operating in electric mode, PHEVs, including the Class Vehicles, do not produce the tailpipe emissions that are produced by vehicles with only internal combustion engines. Operating in electric mode also allows PHEVs, including the Class Vehicles, to consume less fuel than conventional vehicles and is supposed to provide more power and torque than internal combustion engines, giving the Class Vehicles better acceleration and performance.

34.    Defendant marketed the Jeep Wrangler 4xe as the "most capable, technically advanced and eco-friendly Wrangler ever"[7] and the Jeep Grand

---

[7] Press Release, Stellantis, New Jeep® Wrangler 4xe Joins Renegade and Compass 4xe Models in Brand's Global Electric Vehicle Lineup (Sept. 3, 2020),

Cherokee 4xe as the "most technologically advanced and 4x4-capable Jeep Grand Cherokee yet."[8]

35.    Furthermore, as described in a Stellantis press release, "[t]he Jeep brand delivers an open invitation to live life to the fullest by offering a broad portfolio of vehicles that continues to provide owners with a ***sense of safety and security to handle any journey with confidence.***"[9]

36.    FCA's marketing of the Jeep Wrangler 4xe conveyed to consumers that they could have the best of both worlds—an adventurous vehicle that was also emissions friendly and technology driven.



https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1#:~:text=The%202.0%2Dliter%20turbocharged%20I,responsiveness%2C%20performance%20and%20fuel%20efficiency.

[8] Press Release, Stellantis, All-new 2022 Jeep® Grand Cherokee: Most Technologically Advanced, 4x4-capable and Luxurious Grand Cherokee Yet (Sept. 29, 2021), https://media.stellantisnorthamerica.com/newsrelease.do?id=23153&mid=1519.

[9] Press Release, Stellantis, The Jeep® Brand Provides a Glimpse of its Advanced AI & Autonomous Off-Road Driving Technology (May 31, 2023), https://www.media.stellantis.com/em-en/jeep/press/the-jeep-brand-provides-a-glimpse-of-its-advanced-ai-autonomous-off-road-driving-technology (emphasis added).

37.     The vehicle brochures that FCA created and distributed to market 2021-2023 Jeep Wrangler 4xe boasted that the vehicle was "strong," "quick," "expansive," and "easy on the planet."

38.     FCA also touted that "[w]ith 49 MPGe and 21 miles of all-electric range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."[10] Defendant stated that the Jeep Grand Cherokee 4xe could "deliver an estimated 25 miles of all-electric range, 57 miles per gallon equivalent (MPGe)."[11] However, without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG on gasoline alone and the Grand Cherokee only 23 MPG on gasoline alone.

---

[10] Press Release, Stellantis, Jeep® Brand Creates Jeep 4xe Charging Network, Works With Electrify America to Provide EV Charging at Off-road Trailheads Throughout the United States (Mar. 26, 2021), https://media.stellantis northamerica.com/newsrelease.do?id=22622&mid=1.

[11] Press Release, Stellantis, All-new 2022 Jeep® Grand Cherokee: Most Technologically Advanced, 4x4-capable and Luxurious Grand Cherokee Yet, (Sept. 29, 2021), https://media.stellantisnorthamerica.com/newsrelease.do?id=23144&mid=1519.



39.     In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also marketed the vehicle as fit for city driving, especially in all-electric mode. For example, in its 2021 Jeep Wrangler 4xe vehicle brochure, FCA highlighted the two drivetrain modes, including an electric-only mode and an "E-SAVE" mode for low-emission zones in cities.



40.     FCA's marketing of the Jeep Grand Cherokee 4xe conveyed to consumers that they could go from exploring city landmarks to discovering the beauty of nature in "plush luxury" with reduced emissions.

41.     Additionally, FCA's 2022-2023 Jeep Grand Cherokee 4xe vehicle brochures boasted an estimated driving range of over 450 miles based on the estimate of combined fuel consumption ratings, fuel-tank capacity, full battery charge, and hybrid mode.

42.     Defendant made these claims while knowing that it is selling, and has sold, hundreds of thousands of Class Vehicles vulnerable to the Battery Defect and

the corresponding safety risk. These claims have helped Defendant to conceal the Battery Defect's existence in order to sell and lease more vehicles and avoid the financial responsibility to effectively repair and/or replace the defective condition.

### B.   The Battery Defect

43.    The batteries in the Class Vehicles are manufactured by Samsung SDI America, Inc. ("Samsung"). FCA includes a Samsung 400-volt, 17-kWh 48-cell lithium-ion battery pack that uses nickel manganese cobalt ("NMC") graphite chemistry in its 2020-2024 Jeep Wrangler PHEVs and a Samsung 400-volt, 17.3-kWh 48-cell lithium-ion battery pack that uses NMC graphite chemistry in its 2022-2024 Jeep Grand Cherokee PHEVs.

44.    Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode ("cathode"), a negative electrode ("anode"), and an electrolyte.[12]

45.    The electrodes store lithium. The electrolyte carries lithium ions between electrodes.[13] When lithium ions flow from the anode to the positive electrode, energy is discharged from the battery cell in the form of electricity.[14]

---

[12] Chris Woodford, *Lithium-ion batteries*, explainthatstuff, (updated Sept. 11, 2023), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html.

[13] *Id*.

[14] *Id*.

When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[15]

46.    A single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[16]

47.    A module ordinarily contains an array of cells, sensors, controls, mounts, communications capabilities, protective safety devices, and cooling elements or cooling provisions.[17]

48.    Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with the vehicle also plays an important role in the safety of the lithium-ion battery.[18]

---

[15] *Id.*

[16] *See* NHTSA, *Lithium-Ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles* § 4 (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf ("2017 NHTSA Report")

[17] *Id.* at § 4.1.1.

[18] *Id.* at § 4.

49.     Just as important as the design and safety features used in a lithium-ion battery pack is rigorous pre-launch testing.[19] The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Class Vehicles and the significant cost and inconvenience now visited upon Plaintiff and members of the Class.

50.     Most electric and hybrid electric vehicles, like the Class Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[20]

51.     The Class Vehicles contain a defect in the HV battery that can cause vehicle fire and explosions, even when those vehicles are parked with the ignition in the "off" position.

52.     FCA has admitted that the Class Vehicles contain "a high voltage ('HV') battery which may fail internally" and "could lead to a vehicle fire with the ignition on or off."[21]

---

[19] *Id*. at § 8.

[20]   U.S.   Dep't   of   Energy,   *Batteries   for   Electric   Vehicles*, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited Feb. 18, 2025).

[21] NHTSA, Part 573 Safety Recall Report Recall No. 23V-787 (Nov. 22, 2023), https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V787-2073.PDF.

53.    In August of 2024, Samsung communicated to FCA that the Battery Defect was most likely due to "separator damage combined with other complex interactions within the cell."[22]

54.    FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

### 1.    The November 23, 2023 Recall (Recall 23V-787)

55.    On May 12, 2023, having received two field reports of fires originating in the HV battery of model year 2021 Jeep Wrangler PHEVs, the FCA Technical Safety and Regulatory Compliance organization (the "FCA TSRC") opened an investigation.[23] Also in May 2023, FCA requested buybacks of both affected vehicles for further analysis.[24]

56.    From May 2023 to September 2023, FCA received five additional reports of fires originating from the HV battery of model year 2021-2022 Jeep

---

[22] NHTSA, Part 573 Safety Recall Report Recall No. 24V-720 (Sept. 27, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V720-8602.PDF.

[23] NHTSA Recall Number 23V-787, *supra* note 21.

[24] *Id.*

Wrangler PHEVs and requested buybacks of the affected vehicles for further analysis.[25]

57.    On November 22, 2023, six months after opening its investigation into the HV battery fires in the Class Vehicles, and more than three years after FCA began manufacturing and distributing Class Vehicles, FCA recalled certain models years 2021-2023 Jeep Wrangler PHEVs ("Recall 23V-787") and issued its Part 573 Safety Recall Report 23V-787 (the "Recall 23V-787 Report")[26]

58.    The Recall 23V-787 Report described the defect as an "internally failed HV battery" that may lead to a vehicle fire, regardless of whether ignition is on or off, and cautioned that a vehicle fire can result in "increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage."[27]

59.    The Recall 23V-787 Report also stated that 32,125 Jeep Wrangler PHEVs, for models years 2021-2023, were potentially involved and that one percent of those vehicles may have the defect:

> Some 2021-2023 MY Jeep Wrangler Plug-In Hybrid Electric Vehicles ("PHEVs") may have a high voltage ("HV") battery which may fail internally. The defect has not been identified and the root cause is still being investigated.
>
> The suspect period began on September 18, 2020, when production of Jeep Wrangler PHEVs with battery cells

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

manufactured from January 21, 2021, through October 2, 2021 began, and ended on March 22, 2023, when production of vehicles built with battery cells manufactured from January 21, 2021, through October 2, 2021 ended. The suspect population was determined using supplier manufacturing records of HV batteries with cells manufactured from January 21, 2021, through October 2, 2021.

Similar vehicles not included in this recall are not PHEVs, or PHEVs built with cells manufactured outside of the suspect range.[28]

60.     The Recall 23V-787 Report acknowledged that FCA had not identified the root cause of the Battery Defect and advised that the Jeep Wrangler vehicles may have "a high voltage ('HV') battery which may fail internally" and "could lead to a vehicle fire with the ignition on or off."[29]

---

[28] *Id.*

[29] *Id.*





11/23/2023

**New Safety Recall Advanced Communication – B9A**

FCA US LLC (FCA US) has announced a safety recall on certain 2021-2023 model year (JL) Jeep® Wrangler Plug-In Hybrid Electric Vehicles (PHEVs).

**REASON FOR THIS SAFETY RECALL**
Some of the above vehicles may have a High Voltage (HV) battery which may fail internally. The defect has not been identified and the root cause is still being investigated. An internally failed HV battery could lead to a vehicle fire with the ignition on or off. A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.

Customers are advised to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed.

**SERVICE ACTION**
FCA US will conduct a voluntary safety recall on all affected vehicles. Remedy will be a software flash on the HV battery pack and if a DTC sets, the pack will be replaced. The remedy for this condition is not currently available. Dealers will be notified of the launch of this safety recall by way of established communication methods. This recall is estimated to launch in 1st Quarter of 2024.

We ask that you please take the time to ensure that your personnel are aware of this communication and are prepared to execute a customer friendly process for inquiries regarding involved vehicles.

Customer Services Field Operations
FCA US LLC

61.     The Recall 23V-787 Report also advised that 2021-2023 Jeep Wrangler

PHEVs should not be recharged and should not be parked "inside of buildings or

structures, or near other vehicles until the vehicle has the final repair completed."[30]

62.     According to the Recall 23V-787 Report, the proposed remedy was to

be a "software flash on the HV battery pack and if a [diagnostic trouble code] sets,

the pack will be replaced."[31] However, the proposed remedy was not yet available,

---

[30] *Id.*

[31] *Id.*

and a notice to dealers stated that the recall was expected to launch in the first quarter of 2024.[32]

63.     According to FCA, as of October 23, 2024, about 70% of the vehicle recall population (22,726 out of 32,125 vehicles) had been "remedied, inspected without needing remedy, or returned to inventory."[33] But, as set forth below, FCA's proposed remedy has not been effective.

## 2.     Recall 23V-787 Was Under-Inclusive and Ineffective

64.     By April 2024, FCA received additional reports of vehicle fires originating from the HV battery in certain Jeep Wrangler PHEVs and Jeep Grand Cherokee PHEVs. FCA subsequently worked with Samsung to analyze the battery packs from these vehicle to identify the root cause.[34]

65.     On June 25, 2024, following two reports of fires originating from the HV battery in Jeep Wrangler PHEVs that were not part of Recall 23V-787, the FCA TSRC opened a second investigation.[35]

66.     Between June 2024 and July 2024, FCA also received three reports of fires in Jeep Wrangler PHEVs that had already received the Recall 23V-787 remedy.

---

[32] *Id.*

[33]     NHTSA, Recall Quarterly Report, 23V-787 (Oct. 24, 2024), https://static.nhtsa.gov/odi/rcl/2023/RCLQRT-23V787-5641.PDF.

[34] NHTSA, Part 573 Safety Recall Report, *supra* note 22.

[35] *Id.*

FCA thus determined that the Recall 23V-787 remedy was "*ineffective* at detecting certain abnormalities within the HV battery which may lead to a fire."[36]

67.    In August of 2024, Samsung communicated to FCA that the Battery Defect was most likely due to "separator damage combined with other complex interactions within the cell."[37]

### 3.    The September 27, 2024 Recall (Recall 24V-720)

68.    In September 2024, 16 months after it first investigated fires originating from the HV battery in the Class Vehicles and more than four years after FCA began manufacturing and distributing Class Vehicles, FCA initiated a second safety recall of its PHEVs affected by the Battery Defect ("Recall 24V-720").[38] Recall 24V-720 covered over 150,000 PHEVs with HV batteries that "may fail internally and lead to a vehicle fire while parked or driving," including more than 118,000 2020-2024 Jeep Wrangler PHEVs and more than 35,0000 2022-2024 Jeep Grand Cherokee PHEVs.[39]

---

[36] *Id.* (emphasis added).

[37] *Id.*

[38] *Id.*

[39]    NHTSA Recall Notice (Sept. 27, 2024) https://www.nhtsa.gov/?nht saId=24V720000.

69.    The Recall 24V-720 Report identified a fire risk and advised owners to "park outside and away from structures" and "not to recharge their vehicles until they are repaired":

**Safety Issue Type: Recalls**

**September 27 2024**    NHTSA Campaign Number: 24V720000

**High Voltage Battery May Fail and Cause Fire**

A vehicle fire while parked or driving can increase the risk of injury.

**NHTSA Campaign Number**    24V720000

**Manufacturer**    Chrysler (FCA US, LLC)

**Components**    ELECTRICAL SYSTEM

**Potential Number of Units Affected**    154032

**Summary**

Chrysler (FCA US, LLC) is recalling certain 2020-2024 Jeep Wrangler and 2022-2024 Jeep Grand Cherokee vehicles. The high voltage battery may fail internally and lead to a vehicle fire while parked or driving.

**Remedy**

Owners are advised to park outside and away from structures, and not to recharge their vehicles until they are repaired. Dealers will update the high voltage battery pack software and replace the battery pack assembly, if necessary, free of charge. Owner notification letters are expected to be mailed October 17, 2024. Owners may contact Chrysler customer service at 1-800-853-1403. Chrysler's number for this recall is 95B. Vehicles in this recall that were previously recalled for the same issue under NHTSA Recall 23V-787 will need to have the new remedy performed.

**Notes**

Owners may also contact the National Highway Traffic Safety Administration Vehicle Safety Hotline at 1-888-327-4236 (TTY 1-800-424-9153) or go to nhtsa.gov.

**Affected Products (8)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| JEEP | GRAND CHEROKEE | 2022-2024 |
| JEEP | WRANGLER | 2020-2024 |

70.     Although the Recall 24V-720 Report identified substantially more vehicles than had been included in Recall 23V-787 in November 2023, it prescribed the same remedy: a software update and a battery replacement, "if necessary[.]"[40] But, there is no evidence to suggest that this remedy will effectively address the Battery Defect.

71.     FCA mailed recall notices to the owners and lessees of the Class vehicles beginning on October 17, 2024. Plaintiff received a recall notice in early November 2024 stating:

> The High Voltage (HV) battery pack in your vehicle [] may have been built with cells which are susceptible to separator damage. Separator damage … may lead to a vehicle fire. **A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.**
>
> **Vehicle risk is reduced when the battery charge level is depleted. Accordingly, owners are advised to refrain from recharging. Out of an abundance of caution, FCA US is also advising owners of these vehicles to park away from structures or other vehicles until the remedy is obtained.**
>
> **…**
>
> **The remedy for this condition is not currently available**.

72.     On or about January 22, 2025, a software update was performed on Plaintiff's vehicle at a Jeep Dealer, purportedly to "repair" the Battery Defect. However, the defective PHEV battery in Plaintiff's vehicle was not replaced.

---

[40] *Id.*

**C.     FCA Knew or Should Have Known About the Battery Defect Long Before it Disclosed the Problem**

73.    Despite the FCA TSRC investigations beginning in May 2023, FCA knowingly, actively, and affirmatively omitted and/or concealed the existence of the Battery Defect to increase profits by selling and leasing additional Class Vehicles. Knowledge and information regarding the Battery Defect and the associated safety risk was in the exclusive and superior possession of Defendant and its dealers, and was not provided to Plaintiff and members of the Class and Sub-Class, who could not reasonably discover the Battery Defect through due diligence. Based on pre-production testing, design failure mode analysis, and consumer complaints, *inter alia*, Defendant was aware of the Battery Defect in the Class Vehicles and fraudulently concealed the Battery Defect from Plaintiff and members of the Class and Sub-Class.

74.    As set forth below, FCA has long known or should have known that the HV batteries in its PHEVs were susceptible to fire risk. FCA knew or should have known about the Battery Defect before it began selling the Class Vehicles given (1) the well-documented risks of thermal runaway in lithium-ion batteries; (2) the rigorous pre-launch testing FCA should have performed on the HV batteries in the Class Vehicles; (3) consumer complaints lodged with NHTSA and FCA directly; and (4) similar fire issues in similar BMW and Ford vehicles that use Samsung batteries for electric propulsion.

75.    The Battery Defect was inherent in each of the Class Vehicles and was present at the time of sale or lease.

76.    Defendant knew or should have known about the Battery Defect present in the Class Vehicles, along with the corresponding safety risk, and concealed this information from Plaintiff and members of the Class and Sub-Class at the time of sale or lease, repair, and thereafter.

77.    If Plaintiff and members of the Class and Sub-Class had known about the Battery Defect at the time of sale or lease, Plaintiff and members of the Class and Sub-Class would not have purchased or leased the Class Vehicles or would have paid less for them.

78.    The under-inclusiveness and insufficiency of FCA's recalls have allowed Defendant to maximize sales of the Class Vehicles. When FCA issued Recall 23V-787 in November 2023, it did not issue a recall for the additional 120,000 Class Vehicles it knew or should have known were impacted by the Battery Defect and would eventually be subject to Recall 24V-720. Rather, FCA waited nearly a year—until September 2024—to issue Recall 24V-720, having sold approximately 45,000 Jeep Wrangler 4xes and 22,000 Jeep Grand Cherokee 4xes in 2024 in the meantime.[41]

---

[41] *See* Press Release, FCA, FCA Reports First-Quarter 2024 U.S. Sales Results (Apr. 3, 2024), https://www.prnewswire.com/news-releases/fca-reports-first-quarter-2024-us-sales-results-302107281.html; Press Release, FCA, FCA Reports Second-

79.     Defendant's most recent recall may also be under-inclusive. Days before Recall 24V-720, on September 17, 2024, Defendant launched the 2025 Wrangler 4xe promising a "400-volt, 17-kWh, 96-cell, lithium-ion, nickel manganese cobalt battery pack" that "deliver[s] 49 MPGe, 21 miles of all-electric range and zero range anxiety."[42] The 2025 Wrangler 4xe incorporates the same Samsung battery system used in the Class Vehicles and is potentially vulnerable to the same fire risks, but Defendant continues to market and sell these vehicles to consumers.

80.     Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Class Vehicles.[43]

---

Quarter 2024 U.S. Sales Results (Jul. 2, 2024), https://www.prnewswire.com/news-releases/fca-reports-second-quarter-2024-us-sales-results-302188464.html;     Press Release, FCA, FCA Reports Q3 2024 Total U.S. Sales (Oct. 2, 2024), https://www.prnewswire.com/news-releases/fca-reports-q3-2024-total-us-sales-302265584.html.

[42]   FCA, *Press Kit: 2025 Jeep Wrangler 4xe* (Sept. 17, 2024), https://media.stellantisnorthamerica.com/newsrelease.do?id=26169&mid=.

[43] 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of HV lithium-ion batteries in vehicles).

81.    Well before 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[44]

82.    A thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[45] Thermal runaway can result in "extremely high temperatures, violent cell venting, smoke and fire."[46]

83.    In October 2017, NHTSA distributed the 2017 NHTSA Report that summarized an assessment of potential lithium-ion battery vehicle safety issues.[47] The 2017 NHTSA Report explains:

> [T]hermal runaway of a Li[thium]-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Li[thium]-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused

---

[44] *See, e.g.*, Jianwu Wen, et al., *A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions*, Am. Scientific Publishers (2012), https://www.ingentaconnect.com/content/asp/me/2012/00000002/00000003/art00002;jsessionid=2me4jg8qlrdkk.x-ic-live-03#; Xuning Feng, et al, *Thermal runaway mechanism of lithium ion battery for electric vehicles: A review*, ScienceDirect, (2018) https://www.sciencedirect.com/science/article/abs/pii/S2405829716303464.

[45] *What is Thermal Runaway?*, Underwriters Laboratories (Aug. 24, 2021), https://ul.org/research/electrochemical-safety/getting-started-electrochemical-safety/what-causes-thermal#:~:text=Defects%20in%20the%20cell%20that,can%20result%20in%20thermal%20runaway.

[46] *Id.*

[47] 2017 NHTSA Report, *supra* note 16.

by internal or external short circuits, overcharging, and general use [among other things].[48]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[49]

84.     When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Class Vehicles—thermal runaway propagation, causing spontaneous combustion that leads to fires and explosions even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a domino effect that has been dubbed thermal runaway propagation."[50]

85.     The 2017 NHTSA Report, which documented well-known battery fire risks associated with lithium-ion batteries used in PHEVs, cited to the vast body of academic and engineering studies on those risks and recommended rigorous design and testing protocols to protect against those risks. All of this was or should have been known to FCA at the time it launched the Class Vehicles.

_____

[48] *Id.* at § 3.2.

[49] *Id*.

[50] Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, Machine Design (Dec. 26, 2018) https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries.

86.     The 2017 NHTSA Report reiterated that all car manufacturers have a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[51]

87.     The fire risk associated with the use of lithium-ion batteries is central focus of the 2017 NHTSA Report, which recommended protection methods and laid out rigorous testing requirements to mitigate that risk.[52] The major cause of fires arising from lithium-ion batteries is the propagation of thermal runaway.

88.     In addition to the 2017 NHTSA Report, at the time FCA launched the first Class Vehicles in 2020, standards and safety testing protocols had been set forth for lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers, the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[53]

89.     These standards and testing protocols provided FCA with guidelines for design and laboratory testing to ensure the safety of lithium-ion batteries in the Class Vehicles.

---

[51] 2017 NHTSA Report, *supra* note 16, at 11-4.

[52] *See id*. at xvi; *see also id*. at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

[53] 2017 NHTSA Report, *supra* note 16, at 8-1.

90.     All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufacturers, including the Class Vehicles. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

91.     Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires reveal multiple instances of Class Vehicles catching on fire.

92.     FCA has admitted that it is aware of two injuries and 27 consumer complaints about the Battery Defect including *at least eight* fires between May and October 2023 connected with the HV battery in the Class Vehicles, the first of which occurred in or before May 2023.

93.     Furthermore, Samsung, the manufacturer of the electric batteries used in the Class Vehicles, has a history of problems with its HV batteries. Samsung also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford PHEVs that have been recalled and are subject to litigation.[54] In August 2020, Ford recalled its Kuga PHEV due to a fire risk believed to originate from its Samsung HV battery.[55] Similarly, in 2020, BMW recalled over 26,000

---

[54] Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford and BMW PHEV Recalls*, InsideEVs (Oct. 16, 2020), https://insideevs.com/news/449322/samung-sdi-root-ford-bmw-phev-recalls/.

[55] *Id.*

vehicles with Samsung HV batteries due to fire risk, identifying "thermal events" in the Samsung HV batteries in the recalled vehicles as the cause of the recall and explaining that "the battery production process allowed impurities to enter the cell."[56] Upon information and belief, these Ford and BMW recalls were caused by similar defective attributes as present here.

94.   Moreover, in 2022, Samsung recalled more than 1,000 of its electric vehicle batteries (including some used in FCA vehicles) due to poor manufacturing quality.[57]

95.   Knowledge and information regarding the Battery Defect were in the exclusive and superior possession of Defendant, and that information was not provided to Plaintiff and members of the Class and Sub-Class. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, consumer complaints, field reports, aggregate warranty data compiled from dealers, repair orders and parts data received from the dealers, and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Battery Defect in the Class Vehicles and

---

[56] *Id.*

[57] Jung Min-Hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/article View.html?idxno=87120.

fraudulently concealed the Battery Defect and safety risk from Plaintiff and members of the Class and Sub-Class.

96.    Defendant knew, or should have known, that the Battery Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiff and members of the Class and Sub-Class before they purchased or leased Class Vehicles or within the applicable warranty periods.

97.    Notwithstanding Defendant's exclusive and superior knowledge of the Battery Defect, Defendant failed to disclose the Battery Defect to consumers at the time of purchase or lease of the Class Vehicles (or within a reasonable time of learning of the fires caused by the Battery Defect), including during the period in which the Class Vehicles were protected by the New Vehicle Warranty) and continued to sell and lease the Class Vehicles containing the Battery Defect. Defendant intentionally concealed that the Battery Defect presents a safety risk to consumers, including Plaintiff and members of the Class, and the public.

**D.    Plaintiff and Members of the Class and Sub-Class Suffered an Injury**

98.    Plaintiff and members of the Class and Sub-Class suffer ongoing harm as a result of the Battery Defect in the Class Vehicles.

99.    To date, FCA has not provided a remedy that eliminates the Battery Defect in the Class Vehicles.

100.    Instead, FCA has advised owners and lessees of the Class Vehicles to "refrain from charging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed."

101.    Without the ability to recharge the Class Vehicles, Plaintiff and members of the Class and Sub-Class are stuck with a PHEV that can only be operated as a gasoline-powered vehicle. And, without the ability to recharge and utilize the batteries in the Class Vehicles, the hybrid propulsion system becomes deadweight, adding significant weight to the Class Vehicles and requiring Plaintiff and members of the Class and Sub-Class to consume more fuel than a gasoline-powered vehicle. A PHEV that cannot operate on its battery and is less gas-efficient than a gasoline-powered equivalent is not fit for its ordinary purpose. Further, Defendant's instruction to not charge the Class Vehicles actually conflicts with its own guideline to not leave the battery depleted for more than 30 days. Plaintiff and members of the Class and Sub-Class paid a premium of thousands of dollars to purchase PHEVs. Despite the fact that they cannot safely use the electronic propulsion functionality of their vehicles—or even safely park them in their own garages—owners and lessees of the Class Vehicles must continue to make loan, lease, and insurance payments for the Class Vehicles. Unable to safely use the electric mode of the Class Vehicles, Plaintiff and members of the Class and Sub-Class have also paid excess fuel costs.

102. Additionally, the Battery Defect has greatly diminished the value of the Class Vehicles, which are not fit for their ordinary purposes.

103. Furthermore, the injuries and damages suffered by Plaintiff and members of the Class and Sub-Class persist even after Defendant's repeated recalls, which offered ineffective and unavailable remedies. Even after the software update and drive cycle are performed on the Class Vehicles, unless their batteries are replaced with new, non-defective PHEV batteries, the Class Vehicles still contain high voltage batteries that are susceptible to separator damage and pose a potential fire risk. Thus, Plaintiff and other members of the Class and Sub-Class who have received the software update to "repair" the Battery Defect have not received an effective remedy.

104. Plaintiff and members of the Class and Sub-Class are injured in fact, incurred damages, and have suffered ascertainable losses in money and property because of the Battery Defect. Had Plaintiff and members of the Class and Sub-Class known of the Battery Defect, they would not have purchased or leased the Class Vehicles, would have paid substantially less for them, or would have purchased non-hybrid versions of the vehicles, which are significantly less expensive.

## V. TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

105. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Battery Defect and the misrepresentations

and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class and Sub-Class were deceived regarding the Class Vehicles and could not reasonably discover the Battery Defect or Defendant's deception with respect to the Battery Defect.

106.   Plaintiff and members of the Class and Sub-Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or that the Class Vehicles contained the Battery Defect and corresponding safety risk. As alleged herein, the existence of the Battery Defect was material to Plaintiff and members of the Class and Sub-Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class and Sub-Class could not have discovered, through the exercise of reasonable diligence, the existence of the Battery Defect or that Defendant was concealing the defect.

107.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and members of the Class and Sub-Class the true standard, quality, and grade of the Class Vehicles and to disclose the Battery Defect and corresponding safety risk.

108.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class and Sub-Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

109.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or (b)(3) on behalf of the following Class and Sub-Class:

> **Nationwide Class:** All persons or entities who purchased or leased a Class Vehicle (the "Nationwide Class" or the "Class").

> **New York Sub-Class:** All persons or entities who purchased or leased a Class Vehicle in the State of New York (the "New York Sub-Class" or the "Sub-Class").

111.    Excluded from the Class and Sub-Class are Defendant and its parents, subsidiaries, and corporate affiliates. Plaintiff reserves the right to revise the definition of the Class and Sub-Class based upon subsequently discovered information and reserves the right to establish further sub-classes where appropriate.

112.    The Class and Sub-Class are so numerous that joinder of all members is impracticable. Plaintiff believes that there are at least thousands of proposed members of the Class and Sub-Class.

113.    Common questions of law and fact exist as to all members of the Class and Sub-Class and predominate over any issues solely affecting individual members. The common and predominating questions of law and fact include, but are not limited to:

a.  Whether the Class Vehicles contain the Battery Defect;

b.  Whether the Battery Defect is a design defect and/or a defect in material, manufacturing, and/or workmanship;

c.  Whether the Battery Defect in the Class Vehicles presents a safety risk;

d.  Whether and when Defendant knew or should have known about the Battery Defect;

e.  Whether Defendant knew or should have known that the Battery Defect in the Class Vehicles presents a safety risk;

f.  Whether Defendant had a duty to disclose the Battery Defect;

g.  Whether Defendant breached its duty to disclose the Battery Defect;

h.  Whether Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts concerning the standard, quality, or grade of the Class Vehicles and/or the Battery Defect;

i.  Whether Defendant negligently omitted material facts concerning the standard, quality, or grade of the Class Vehicles and/or the Battery Defect;

j.  Whether Defendant made material omissions concerning the standard, quality, or grade of the Class Vehicles and/or the Battery Defect;

k.  Whether members of the Class and Sub-Class would pay less for a Class Vehicle if Defendant, at the time of purchase or lease, disclosed the Battery Defect;

40

l.  Whether members of the Class and Sub-Class would have purchased or leased a Class Vehicle if Defendant, at the time of purchase or lease, disclosed the Battery Defect;

m.  Whether Defendant actively concealed material facts from Plaintiff and members of the Class and Sub-Class in order to, *inter alia*, sell more Class Vehicles and/or transfer repair or replacement costs to Plaintiff and members of the Class and Sub-Class;

n.  Whether Defendant breached its express and/or implied warranties to Plaintiff and members of the Class and Sub-Class;

o.  Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.;

p.  Whether Defendant violated the New York General Business Law, N.Y. Gen. Bus. Law § 349;

q.  Whether Defendant violated the New York General Business Law, N.Y. Gen. Bus. Law § 350;

r.  Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

114.  Plaintiff's claims are typical of the claims of the Class and Sub-Class that Plaintiff seeks to represent. As alleged herein, Plaintiff and the Class and Sub-

Class sustained damages arising out of the same unlawful actions and conduct by Defendant.

115. Plaintiff is willing and prepared to serve the Class and Sub-Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and Sub-Class and has no interest adverse to or in conflict with the interests of the other members of the Class and Sub-Class.

116. Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Class and Sub-Class. Plaintiff will undertake to represent and protect the interests of absent members within the Class and Sub-Class and will vigorously prosecute this action.

117. Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiff and absent members of the Class and Sub-Class.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by Plaintiff and the other Class and Sub-Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class

and Sub-Class to individually seek redress for FCA's wrongful conduct. Even if Class and Sub-Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

119.   Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class and Sub-Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

120.   The Class and Sub-Class may also be certified under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class and Sub-Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class and Sub-Class.

121.   The interest of members within the Class and Sub-Class individually controlling the prosecution of separate actions is theoretical and not practical. The

Class and Sub-Class have a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

122.   The nature of notice to the proposed Class and Sub-Class is contemplated to be by direct mail upon certification of the Class and Sub-Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII.   CLAIMS FOR RELIEF

### COUNT I
### Violation of the Magnuson-Moss Warranty Act ("MMWA")
### 15 U.S.C. § 2301, *et seq.*
### (On behalf of Plaintiff and the Nationwide Class)

123.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

124.   Plaintiff brings this count individually and on behalf of all Nationwide Class members.

125.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

126.   Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

127.   Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

128.    Defendant's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

129.    The MMWA provides a cause of action for any customer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

130.    Defendant provided Plaintiff and members of the Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Specifically, Defendant provides New Vehicle Limited Warranty coverage and HV Battery Limited Warranty Coverage for the Class Vehicles. The New Vehicles Limited Warranty Coverage applies for 3 years or 36,000 miles and includes all components other than normal wear and maintenance items. The HV Battery Limited Warranty Coverage applies for 8-years or 100,000 miles in states that do have TZEV mandates, including New York.

131.    Under warranties provided to members of the Class, Defendant promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Battery Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Defendant breached these warranties.

132.    Plaintiff and members of the Class experienced the Battery Defect within the warranty periods, but Defendant failed to inform Plaintiff and members

of the Class of the existence of the Battery Defect and associated safety hazard, and failed to provide a suitable remedy or repair of the Battery Defect free of charge within a reasonable time.

133.   Any attempt by Defendant to disclaim or limit its express or implied warranties is unconscionable and unenforceable here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The limits contained in Defendant's warranty periods are also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and members of the Class did not determine these limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that the Class Vehicles' batteries were defective at the time of sale or lease and that they posed a safety risk.

134.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

135.   Defendant breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the Class Vehicles and the presence of the Battery Defect. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or

46

workmanship that fails to operate as represented by Defendant and presents a safety risk.

136.   Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and at all relevant times thereafter, Defendant knew, or was reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Battery Defect, but failed to repair or remedy and/or disclose the Battery Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

137.   Plaintiff and members of the Class would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them to Defendant. Thus, Plaintiff and members of the Class have not re-accepted their Class Vehicles by retaining them.

138.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

139.   Plaintiff, individually and on behalf of members of the Class, seeks all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT II
### Breach of Express Warranty
### N.Y. U.C.C. Law §§ 2-314, 2-A-210
### (On behalf of Plaintiff and the New York Sub-Class)

140.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

141.   Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

142.   Defendant marketed the Class Vehicles as safe, reliable vehicles. Such representations formed the basis of the bargain in Plaintiff's and members of the Sub-Class's decisions to purchase or lease the Class Vehicles.

143.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

144.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2-A-103(1)(h).

145.   In connection with the purchase or lease of each of the Class Vehicles, Defendant provides New Vehicle Limited Warranty coverage and HV Battery Limited Warranty Coverage for the Class Vehicles. The New Vehicles Limited

Warranty Coverage applies for 3 years or 36,000 miles and includes all components other than normal wear and maintenance items. The HV Battery Limited Warranty Coverage applies for 8-years or 100,000 miles in states that do have TZEV mandates, including New York.

146.   Under the express warranties provided to Plaintiff and members of the Sub-Class, Defendant promised to repair or replace covered components of the Class Vehicles, including the HV Battery, arising out of defects in materials and/or workmanship, including the Battery Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Defendant breached these express warranties. Defendant's express warranties formed a basis of the bargain that was reached when Plaintiff and members of the Sub-Class purchased or leased their Class Vehicles.

147.   The Battery Defect at issue in this litigation was present at the time the Sub-Class Vehicles were sold to Plaintiff and members of the Sub-Class.

148.   Plaintiff relied on Defendant's express warranties, which were a material part of the bargain, when purchasing his Class Vehicle.

149.   Plaintiff and members of the Sub-Class experienced the existence of the Battery Defect within the warranty periods but had no knowledge of the existence of this defect and associated safety hazard, which were known and concealed by Defendant. Despite the existence of the warranties, Defendant failed to inform

Plaintiff and members of the Sub-Class that the Class Vehicles contained the Battery Defect and failed to provide a suitable remedy or repair free of charge within a reasonable time.

150.   Under the express warranties, FCA was obligated to correct the Battery Defect in the Class Vehicles.

151.   Defendant breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied, including the HV Battery.

152.   On information and belief, Defendant has not suitably repaired or replaced the Battery Defect free of charge for Plaintiff and members of the Sub-Class despite the existence of the Battery Defect in the Class Vehicles at the time of sale or lease.

153.   Defendant was provided notice of the Battery Defect by numerous field reports, consumer complaints, and through its own testing. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant has known of and concealed the Battery Defect and has failed to provide a suitable repair or replacement of the Battery Defect free of charge within a reasonable time. Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

154.    Defendant provided warranties directly to Plaintiff and members of the Sub-Class, and Plaintiff and members of the Sub-Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no right under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

155.    Any attempt by Defendant to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the defect. The limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Sub-Class. Among other things, Plaintiff and the members of the Sub-Class did not determine these limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Sub-Class, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Battery Defect posed a safety hazard.

156.    Plaintiff and the Sub-Class members have complied with all obligations under the express warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

157.   Because Defendant, through its conduct and exemplified by its own service bulletins, has issued recalls for Class Vehicles with the Battery Defect, Defendant cannot now deny that the express warranties cover the Battery Defect.

158.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and members of the Sub-Class whole, rendering it null and void.

159.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Sub-Class have been damaged and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles.

160.   As a direct and proximate result of Defendant's breach of the express warranties, Plaintiff and members of the Sub-Class have been damaged in an amount to be proven at trial.

161.   Finally, because of Defendant's breach of express warranties as set forth herein, Plaintiff and members of the Sub-Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and members of the Sub-Class of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT III**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314, 2-A-212**
**(On behalf of Plaintiff and the New York Sub-Class)**

162.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

163.   Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

164.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

165.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2-A-103(1)(h).

166.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. U.C.C. Law §§ 2-314 and 2-A-212.

167.   Plaintiff and members of the Sub-Class purchased or leased the Class Vehicles from Defendant by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, FCA was the manufacturer, distributor, warrantor, lessor, and/or seller of the Class Vehicles. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or

leased. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and the Sub-Class members, with no modification to the defective batteries.

168. Defendant impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and batteries that were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their batteries would be fit for their intended use while the Class Vehicles were being operated.

169. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect—the Battery Defect—(at the time of sale or lease and thereafter), and present an undisclosed safety hazard to drivers and occupants. Defendant knew of this defect at the time these sale transactions occurred. Thus, Defendant breached its implied warranty of merchantability in violation of N.Y. U.C.C. Law §§ 2-314 and 2-A-212.

170. Defendant cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

171.   Defendant was provided notice of the Battery Defect by consumer complaints, and through its own testing. Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Battery Defect and, on information and belief, has refused to repair the Battery Defect free of change within a reasonable time.

172.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and members of the Sub-Class have been damaged in an amount to be proven at trial.

173.   Any attempt by Defendant to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Battery Defect. The limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Sub-Class. Among other things, Plaintiff and members of the Sub-Class did not determine these limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Sub-Class, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Battery Defect posed a safety hazard.

174.   Plaintiff and members of the Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

175.   Defendant provided warranties directly to Plaintiff and members of the Sub-Class, and Plaintiff and members of the Sub-Class are the intended beneficiaries of the Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no right under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

176.   As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff and members of the Sub-Class have been damaged and continue to suffer damages, including economic damages, at the point of sale and diminution of value of their Class Vehicles.

177.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and members of the Sub-Class have been damaged in an amount to be proven at trial.

**COUNT IV**
**Fraudulent Concealment**
**(On behalf of Plaintiff and the New York Sub-Class)**

178.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

179.  Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

180.  Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Battery Defect in the Class Vehicles, with the intent that Plaintiff and members of the Sub-Class rely on Defendant's omissions. As a direct result of Defendant's fraudulent conduct, members of the Sub-Class have suffered actual damages.

181.  Defendant knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Battery Defect, concealed the Battery Defect, and never intended to repair or replace the Battery Defect during the warranty periods. To date, Defendant has not provided Plaintiff or members of the Sub-Class with a repair or remedy that will eliminate the Battery Defect.

182.  Defendant owed a duty to disclose the Battery Defect and its corresponding safety hazard to Plaintiff and members of the Sub-Class because Defendant possessed superior and exclusive knowledge regarding the Battery Defect. Rather than disclose the Battery Defect, Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Battery Defect, to sell additional Class Vehicles and avoid the cost of repair or replacement.

183.    The fact that the Battery Defect causes batteries in the Class Vehicles to fail and cause a fire is material because Plaintiff and members of the Sub-Class had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard. No reasonable consumer expects a vehicle to be designed, manufactured, and assembled such that the battery would unexpectedly fail and cause the vehicle to catch fire.

184.    Plaintiff and members of the Sub-Class would not have purchased or leased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Battery Defect, or would have paid less for the Class Vehicles.

185.    Defendant knew its concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts. Defendant knew its concealment and suppression of the Battery Defect would sell more Class Vehicles and would discourage Plaintiff and members of the Sub-Class from seeking replacement or repair of the Battery Defect. Further, Defendant intended to induce Plaintiff and members of the Sub-Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Battery Defect, in order to decrease costs and increase profits.

186.    Defendant acted with fraudulent intent when it omitted information regarding the Battery Defect in order to continue profiting from sale of the Class

Vehicles and when it offered under-inclusive and insufficient remedies addressing the Battery Defect.

187.   Defendant owed Plaintiff and the Sub-Class members a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Sub-Class members relied on Defendant's material representations that the Class Vehicles they were purchasing were safe and free from defects.

188.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Sub-Class members would not have bought or leased the Class Vehicles, or would not have bought or leased the Class Vehicles at the prices they paid.

189.   Plaintiff and the other Sub-Class members relied on Defendant's reputation—along with Defendant's failure to disclose the faulty and defective nature of the Class Vehicles—in purchasing or leasing the Class Vehicles.

190.   Plaintiff and members of the Sub-Class reasonably relied upon Defendant's knowing concealment and omissions. As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Battery Defect and associated safety hazard, Plaintiff and members of the Sub-Class have suffered actual damages in an amount to be determined at trial, including, but

not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

191.    Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Sub-Class members. Plaintiff and the other Sub-Class members are therefore entitled to an award of punitive damages.

**COUNT V**
**Negligent Misrepresentation**
**(On behalf of Plaintiff and the New York Sub-Class)**

192.    Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

193.    Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

194.    Defendant owed a duty to disclose the Battery Defect and its corresponding safety risk to Plaintiff because Defendant possessed superior and exclusive knowledge regarding the Battery Defect and associated risks.

195.    Defendant negligently omitted material facts including the standard, quality, and grade of the Class Vehicles and/or the presence of the Battery Defect in the Class Vehicles. As a direct result of Defendant's negligent conduct, Plaintiff and members of the Sub-Class have suffered actual damages.

196.   The Battery Defect is material to Plaintiff and members of the Sub-Class because Plaintiff and members of the Sub-Class had a reasonable expectation that the vehicles would not contain a defect, such as the Battery Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Battery Defect, that can lead to thousands of dollars in repair or replacement costs, and can cause the batteries to fail, causing Class Vehicles to suddenly catch fire and/or explode.

197.   Plaintiff would not have purchased the Class Vehicles but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and/or the existence of the Battery Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff and members of the Sub-Class justifiably relied upon Defendant's negligent omissions of materials facts.

198.   As a direct and proximate result of Defendant's negligent omissions or material facts regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Battery Defect and corresponding safety risk, Plaintiff and members of the Sub-Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

**COUNT VI**
**Violation of New York's General Business Law**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of Plaintiff and the New York Sub-Class)**

199.    Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

200.    Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

201.    Plaintiff and members of the Class are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

202.    FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349(b).

203.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a).

204.    Defendant engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL. By developing and installing defective battery systems in Class Vehicles, by failing to disclose and actively concealing the Battery Defect from regulators and consumers alike, by marketing, offering for sale, and selling its Class Vehicles and their batteries as high quality, durable, and high-performance, and by presenting themselves as reputable manufacturers that valued safety and stood behind its vehicles after they were sold,

Defendant engaged in deceptive business practices prohibited by the New York GBL.

205.   In the course of its business, Defendant violated the New York GBL by knowingly misrepresenting and/or intentionally concealing material facts regarding the Class Vehicles and the existence of the Battery Defect. Specifically, in marketing, offering for sale, and selling the defective Class Vehicles, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by the New York GBL:

a.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b.  Representing that the Class Vehicles have characteristics or benefits that they do not have;

c.  Representing that the Class Vehicles are of a particular standard and quality when they are not;

d.  Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

e.  Carrying out other actions that created a likelihood of confusion or of misunderstanding.

206.   Defendant's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Sub-Class members, and Defendant

misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Sub-Class members would rely on the misrepresentations, concealments, and omissions. The facts concealed or not disclosed by Defendant to Plaintiff and the Sub-Class members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's battery contains a defect causing fire or explosion is a material safety concern. Had they known the truth, Plaintiff and the Sub-Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

207.   Plaintiff and the Sub-Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

208.   Defendant had an ongoing duty to Plaintiff and the Sub-Class members to refrain from unfair and deceptive practices under the New York GBL in the course of its business. Specifically, Defendant owed Plaintiff and the Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Sub-Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

209.   In the course of its business, Defendant violated N.Y. Gen. Bus. Law § 349 by engaging in unfair and deceptive practices when it failed to disclose all material facts regarding the defective nature of the Class Vehicles. FCA still has not revealed the scope of its knowledge, the true nature of the Battery Defect, and the results from its investigation and testing of the Class Vehicles.

210.   Plaintiff and the Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

211.   Defendant's conduct constitutes a continuing risk to Plaintiff and Sub-Class members, as well as to the public. The unlawful acts and practices alleged herein affect the public interest.

212.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and each Sub-Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiff and Sub-Class members also seek attorneys' fees, an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under the New York GBL.

**COUNT VII**
**Violation of New York's General Business Law,**
**N.Y. Gen. Bus. Law § 350**
**(On behalf of Plaintiff and the New York Sub-Class)**

213.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

214.   Plaintiff brings this count individually and on behalf of all New York Sub-Class members.

215.   New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect[,]" taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a(1).

216.   Defendant made or disseminated in New York statements, which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff and the Sub-Class members.

217.   In the course of its business, Defendant violated the NY FAA by knowingly misrepresenting and/or intentionally concealing material facts regarding the Class Vehicles and the existence of the Battery Defect. Specifically, in

66

marketing, offering for sale, and selling or leasing the defective Class Vehicles, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by the NY FAA:

a. Representing that the Class Vehicles have characteristics or benefits that they do not have;

b. Representing that the Class Vehicles are of a particular standard and quality when they are not;

c. Advertising the Class Vehicles with the intent not to sell or lease them as advertised; and/or

d. Carrying out other actions that created a likelihood of confusion or of misunderstanding.

218.   Defendant's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Sub-Class members, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Sub-Class members would rely on the misrepresentations, concealments, and omissions. The facts concealed or not disclosed by Defendant to Plaintiff and the Sub-Class members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles or to pay less for them. Whether a vehicle's battery contains a defect causing fire or explosion is a material safety concern. Had they known the truth,

Plaintiff and the Sub-Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

219. Plaintiff and the Sub-Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

220. Defendant had an ongoing duty to Plaintiff and the Sub-Class members to refrain from unfair and deceptive practices under the NY FAA in the course of its business. Specifically, Defendant owed Plaintiff and the Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Sub-Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

221. Plaintiff and the Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's deceptive advertising.

222. All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or a generalized course of conduct that is continued and repeated in New York.

223.   Plaintiff and the Sub-Class members are entitled to recover their actual damages or $500, whichever is greater. Because Defendant acted willfully or knowingly, Plaintiff and the Sub-Class members are entitled to recover three times actual damages, up to $10,000.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiff and the Class and Sub-Class, and award the following relief:

a.  An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Sub-Class, and Plaintiff's counsel as counsel for the Class and Sub-Class;

b.  An order awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

c.  Appropriate injunctive and equitable relief;

d.  A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

e.  An order awarding costs, restitution, disgorgement, punitive damages, statutory damages, treble damages, and exemplary damages under applicable

law, and compensatory damages for economic loss, diminished value, and out-of-pocket costs in an amount to be determined at trial;

f.  An order awarding any applicable statutory and civil penalties;

g.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

h.  An award of costs, expenses, and attorneys' fees as permitted by law; and

i.  Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

DATED: March 4, 2025                    Respectfully submitted,

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

*/s/ Joseph H. Meltzer*
Joseph H. Meltzer
jmeltzer@ktmc.com
Tyler S. Graden
tgraden@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff and the Proposed Classes*